**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| SHELBY SHRAUNER (n/k/a BRIGHTHEART-PIXIE), <br><br> Appellant, <br><br> v. <br><br> DAIN OLSEN, <br><br> Respondent. | No. 53416-9-II <br><br><br> ORDER GRANTING MOTION TO PUBLISH AND PUBLISHING OPINION |

Non-party applicant, Ian C. Cairns, moves for publication of the court's unpublished opinion filed December 29, 2020. After consideration, the court grants the motion. It is now

**ORDERED** that the final paragraph in the opinion which reads "A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered." is deleted. It is further

**ORDERED** that the opinion will now be published.

It is further ordered that the appellant's "Motion to Expedite Consideration of Motion to Publish" is hereby denied.

**SO ORDERED.**

**PANEL:** Jj. Lee, Glasgow, Cruser

**FOR THE COURT:**

_____
CRUSER, J.

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| SHELBY SHRAUNER (n/k/a BRIGHTHEART-PIXIE), | No. 53416-9-II |
| Appellant, | |
| v. | |
| DAIN OLSEN, | UNPUBLISHED OPINION |
| Respondent. | |

CRUSER, J. — Shelby Brightheart and Dain Olsen had a son, EB, in 2013. Brightheart and Olsen eventually separated and shared residential time with EB under an informal agreement, with Brightheart taking the role of primary residential parent. In 2017, after filing a petition for a parenting plan, Brightheart received an opportunity to become a part-owner of Skalitude, a retreat center located in the Methow Valley. Olsen opposed Brightheart's relocation, and the parties went to trial. The trial court restrained Brightheart's relocation and entered a parenting plan and child support order designating Olsen as EB's primary residential parent.

Brightheart appeals from the trial court's memorandum opinion, the order denying her petition for relocation, the final parenting plan and child support order, and the order denying her motion for reconsideration. Brightheart argues that the trial court (1) abused its discretion in denying her petition for relocation with EB because it failed to apply the statutory presumption under former RCW 26.09.520 (2000), and its findings were either unsupported by substantial

evidence or irrelevant under the factors enumerated in former RCW 26.09.520. Brightheart also requests that this court remand this case for a fact finding hearing on entry of a permanent residential schedule because (2) the trial court abused its discretion in entering the final parenting plan by not considering whether switching primary residential parents was in EB's best interest under RCW 26.09.187(3), and (3) the trial court abused its discretion in denying her motion for reconsideration by declining to consider evidence that Brightheart would not relocate following the trial court's denial of her petition. Brightheart further requests that this court (4) vacate the child support order and (5) remand with instructions to assign this case to a different judge.

We hold that the trial court abused its discretion in denying Brightheart's petition for relocation. Accordingly, we reverse the trial court's order denying Brightheart's petition seeking relocation and remand to the trial court for further proceedings. In addition, because we reverse the trial court's relocation order, we also reverse and vacate the permanent residential schedule and child support order, and we vacate the award of attorney fees imposed on Brightheart for filing her motion for reconsideration. On remand, we order that this case be assigned to a different judge.

FACTS

I. BACKGROUND FACTS

Brightheart and Olsen first met at a pagan spiritual gathering in 2009. The following year, the two met again when Olsen came to an "intentional community"[1] and farm in Chimacum. Verbatim Report of Proceedings (VRP) (Dec. 31, 2018) at 25. Olsen was "traveling around" at

---

[1] As the term is used by Brightheart, an "intentional community" describes a "way that people are choosing to live and work together," and in this instance refers to a "plot of land in Chimacum where there were several families living there and working together." Verbatim Report of Proceedings (VRP) (Dec. 31, 2018) at 25.

that time in his life, but he settled on the farm in Chimacum and became part of the community. *Id.* Brightheart eventually joined Olsen on the farm. While living on the farm, Brightheart and Olsen shared mutual values focused on "a connection and an honoring of the earth and of the elements of nature." *Id.* at 26.

Brightheart and Olsen began their romantic relationship in 2010. Eventually, they moved to a cabin in Discovery Bay in 2011 and had a son, EB, in 2013.

Both Brightheart and Olsen have children from prior relationships. Brightheart has an older son, HS, who resides with her. Olsen has two daughters from a prior marriage. In 2008, Olsen left the Army National Guard, left his family, and took a backpack to travel the west coast of the United States, eventually arriving in Washington State where he met Brightheart. Olsen has not seen his daughters since 2010 and has no present relationship with them.

Brightheart and Olsen lived together in the Discovery Bay cabin until their separation in 2015. Olsen continues to reside in the cabin. The space consists of one large open room, a bathroom, and an upstairs bedroom loft. The cabin also has a yard and a garden patch. It is located just off Highway 101 and is surrounded by approximately 40 acres of "wooded" and "timber" property. VRP (Jan. 2, 2019) at 445. A fire station is less than one mile down the road from the cabin, and the nearest neighbors are about 150 to 200 yards away.

While Brightheart and Olsen lived on the farm in Chimacum, Olsen worked as an in-home caregiver. Olsen then started his own carpentry business in 2013. After the couple separated, Olsen worked as a security guard for two years, until 2018. He later obtained a position as a materials handler for the Department of Defense, where he continues to work.

In 2009, Brightheart received an education in childbirth and labor support, obtaining a certificate of completion from Bastyr University. She worked as a birth assistant for some time and later did an apprenticeship with an herbalist. Brightheart briefly worked at the Port Townsend Food Co-op in the herbal medicines and wellness department. However, since EB was born, Brightheart has not had traditional full time or wage-based employment. Brightheart operated the Wild Rose Forest School, a nature-based education program for children that EB attended, and she ran her herbal healing business. Her work allowed her to be present with her children and she specifically oriented her career and employment around her role as a mother.

The family also attended an event called the "Fairy and Human Relations Congress," at the Skalitude Retreat center in the Methow Valley. *Id.* at 227-28. Brightheart was involved in setting up the event and coordinating the children's program, and Olsen attended mostly to support her. The event spans several days and includes educational seminars and other activities.

Brightheart and Olsen separated in April of 2015 and Brightheart moved out of the cabin and into a "wooden-walled" yurt that she rented in Irondale with EB, then 17 months old, and HS, who was 7 years old. VRP (Dec. 31, 2018) at 77. A "yurt" is a "tent-style dwelling" that has an "open, round structure." *Id.* There were no interior walls in the yurt, but the yurt did contain a kitchen with a stove, oven, refrigerator, and sink. There was no shower or bathroom inside the yurt itself, but there was a bathroom on the property.

Brightheart continued to operate the Forest School from which she earned approximately $250 to $500 a month. Although Olsen was under no legal obligation to do so, Olsen paid Brightheart $400 per month as an informal child support payment. Brightheart relied on this money, but occasionally the payments were late or were not provided at all. Olsen contends that

he was consistent in making his voluntary payments to Brightheart. Brightheart also relied on Supplemental Nutrition Assistance Program benefits to make ends meet.

The parties had an informal arrangement for visitation, with Olsen spending time with EB as frequently as his work schedule permitted. This meant that Olsen spent two or three overnights per week with EB.

In the summer of 2015, Brightheart entered into a relationship with Benjamin Pixie. Pixie is a beekeeper who operates a business that keeps bees, harvests honey, and infuses the honey with botanical medicine, which he then markets and sells. Pixie has two children of his own from a prior relationship. He shares residential time equally with his former spouse. Brightheart and Pixie were not exclusive when they first began their relationship. Brightheart and Pixie moved cautiously in part because at that time, Pixie lived two hours away in Olympia and traveled frequently for work, and in other part because they wanted to be slow and intentional in introducing their children to new people.

During this period, in the summer of 2016, Rick Ralls proposed marriage to Brightheart. At that time, Brightheart accepted his proposal because he had been a family friend for more than a decade and had developed a strong relationship with her sons. Brightheart believed that entering this partnership would help her provide a better life for her children. However, Brightheart determined that she was not entering the marriage for the right reasons and amicably ended the relationship with Ralls.

Thereafter, Brightheart resumed her relationship with Pixie. By January of 2017, Brightheart and Pixie were fully committed to their relationship and started the process of blending their families. Then, in June of 2017, Brightheart and Pixie had a "ceremony of commitment,"

attended by just them and their four children. VRP (Jan. 2, 2019) at 292. They have considered themselves married since that time, although they planned to legally marry in May of 2020. Pixie has a strong bond with EB, and the four children between the two blended families are "like siblings." VRP (Dec. 31, 2018) at 23. In particular, EB and Pixie's youngest son are close in age and regard each other as brothers.

## II. PETITION TO ESTABLISH A PARENTING PLAN AND CHILD SUPPORT

Brightheart signed a petition seeking a parenting plan, residential schedule, and child support for EB in January of 2017, which she filed in May of 2017. Brightheart proposed a parenting plan wherein Olsen would have residential time with EB from Wednesday through Friday the first and third weeks of every month, and from Thursday through Sunday on the second and fourth weeks of every month, for a total of five overnights every two weeks. This proposed schedule was relatively consistent with the amount of time Olsen had been spending with EB.

In March of 2017, between signing and filing her petition, Brightheart submitted an application for "non-assistance support services," to the Department of Social and Health Services Division of Child Support (DCS). Clerk's Papers (CP) at 34. Following an administrative hearing, DCS determined that Olsen was to pay Brightheart $393.00 monthly and that Olsen had accrued $1,794.24 in arrears. DCS also determined that Brightheart was voluntarily "self-employed, because she can bring the Child, as well as another child in her home by a different relationship ([HS], age 9) with her to work." *Id.* at 32. DCS imputed a minimum wage income to Brightheart.

In September of 2017, Brightheart served Olsen with the petition, and he responded that he disagreed with Brightheart's proposed parenting plan and child support schedule. Olsen moved for entry of a temporary parenting plan and child support order. The trial court entered a temporary

order with a residential schedule consistent with Brightheart's initial proposed parenting plan. This schedule provided that Olsen would have five overnights with EB every two weeks. The parties changed the schedule to accommodate Olsen's new work schedule in March of 2018, but Olsen maintained the same amount of residential time and spent every day that he had off with EB. The parties established a summer schedule for EB and were scheduled to go to trial on entry of the final parenting plan on September 14, 2018.

III. OPPORTUNITY TO PURCHASE SKALITUDE RETREAT CENTER

In the summer of 2018, Pixie's former spouse moved to Carlton, Washington, 15 minutes away from the Skalitude Retreat center. Pixie began to entertain the idea of moving to that area to open a bee sanctuary and to offer educational internships and classes about beekeeping.

An opportunity arose for Pixie and Brightheart to purchase the Skalitude property and the retreat center business. With two other investors, Brightheart and Pixie formed Skalitude LLC to purchase the land and the retreat center business from Lyndsey Swope, who had owned and operated Skalitude for nearly 20 years prior. Brightheart and Pixie also formed Brightheart Pixie, LLC to represent their one-third ownership interest in Skalitude LLC. Brightheart Pixie, LLC contributed $200,000 to the venture, though Brightheart did not contribute financially with her own funds. Brightheart described her contribution as "sweat equity," meaning her work on the project would be "valued as ownership in the property [she would be] working on." VRP (Jan. 2, 2019) at 281.

The Skalitude Retreat business hosts education-centered events, with clients like Bastyr University and the North Cascades Institute. In addition to the education focused events, the retreat business hosts gatherings such as the Fairy and Human Relations Congress, it offers wedding

services, and it provides year-round vacation rentals. The property consists of 160 acres in the Methow Valley in Okanogan County, Washington. The facilities are "off-the-grid" with a "fully-functioning" solar power system and backup generator, with a well and spring water on site. VRP (Dec. 31, 2018) at 70. The property includes a house where Pixie and Brightheart could reside with their family with no additional housing or utilities costs. The site also contains an additional residential cabin and lodging facilities for guests of the retreat center.

While living on the property, Brightheart would act as caretaker of the land and business, and she would also manage the Skalitude LLC, earning approximately $750 per month. Brightheart would earn additional income working for Pixie's honey company. Residing in Skalitude would provide the opportunity to both participate in a connected and active community that "gather[s] regularly for potlucks, community cider pressings, [and] bonfires," while also affording the "spaciousness and the immediate connection and opportunity for nature exploration," which is of particular importance to Brightheart and her family. *Id.* at 95, 94.

## IV. NOTICE OF INTENT TO RELOCATE

On July 29, 2018, Brightheart sent Olsen an email notifying him of her intent to relocate to Skalitude with EB that September, when the sale was scheduled to close. By that time, the process of purchasing Skalitude had been well underway. Brightheart filed a motion to enter a temporary parenting plan on August 20, 2018, explaining that she had "an opportunity to establish an educational retreat in the Methow Valley." CP at 67. Along with this motion, Brightheart filed a declaration which stated that "living farther away from [her] son's father and getting some space from [their] contentious relationship and hostile interactions will reduce [her] stress and benefit [her] health, wellbeing and sense of safety." *Id.* at 71. In a declaration submitted to the trial court

on August 30, 2018, Brightheart explained further that that Olsen had a history of alcoholism and had been verbally abusive towards her son HS before they separated.

On September 4, 2018, with assistance from her attorney, Brightheart filed a notice of intent to relocate along with a proposed parenting plan. The parenting plan provided that Olsen would have EB from Thursday through Sunday every other weekend. Olsen objected and requested that the trial court designate him as the primary residential parent and temporarily restrain Brightheart's relocation.

Brightheart submitted a declaration on September 6, 2018, explaining HS had been enrolled in Methow Valley Elementary, and that school had begun on September 4, 2018. Brightheart also stated that she enrolled EB in a Methow Valley Montessori preschool to hold his place there, but that due to the ongoing relocation proceedings and Olsen's objection to EB's enrollment, she has chosen to delay starting EB in preschool until the relocation matter could be resolved. Pixie, meanwhile, had already moved onto the Skalitude property.

On September 12, Olsen moved for a temporary order preventing Brightheart from moving with EB. He explained that he did not receive sufficient notice of Brightheart's intended relocation and that there is no reason justifying Brightheart's need to relocate before the matter is decided. Olsen also submitted a proposed parenting plan which would maintain the present residential schedule, with EB spending five overnights with him every two weeks, corresponding with Olsen's work.

The trial court held a hearing on October 5, 2018, on the issue of Brightheart's temporary relocation with EB prior to trial. Olsen argued that based on the information in Brightheart's declaration, it was apparent that Brightheart had already moved and was living in Skalitude. Olsen

suggested that Brightheart had rented her yurt out to a different individual. Brightheart countered that she has maintained her residence in Jefferson County and has adhered to the residential schedule, and that she had not rented her yurt to anyone else. She explained that she has been spending time at Skalitude, and that Pixie has been assisting her with getting her older son, HS, to school. The trial court stated that it was not convinced that Brightheart was truly "'living'" in Jefferson County as opposed to "'maintaining'" a residence there. *Id.* at 241. Regardless, the trial court ruled that Brightheart would have to "figure out" how to get to the drop-off location in Jefferson County, and it ordered that the temporary residential schedule providing Olsen with five overnights every two weeks would remain in place. *Id.* at 242.

## V. TRIAL

The matter proceeded to trial beginning on December 31, 2018. Brightheart testified regarding her values and the fact that she had organized her professional life to allow her to maximize time with her children and to foster their connection to nature, the environment, and community. Brightheart also testified to the quality of education in the Methow Valley Public School district and expressed her opinion that EB would receive a superior education there.

Pixie, Brightheart, and Swope testified regarding Skalitude's viability as a business venture and the opportunities provided to Brightheart's family in operating and running the retreat center beyond the financial benefits. The trial court also heard from William Dickey, an owner and investor of Skalitude LLC who testified that he had funds available to ensure that Skalitude could continue operating, though he acknowledged that he was under no legal obligation to provide additional funds should it become necessary.

Olsen questioned whether Brightheart had done her due diligence in investigating Skalitude's financial viability given the LLC's mortgage obligations and her expectation of receiving monthly income from the LLC. Brightheart responded that prior to purchasing the property, the LLC had a real estate agent, an attorney, and a financial professional advise them in the process and the financial professional offered the opinion that the business was financially viable.

Olsen testified regarding various activities that he and EB enjoyed doing together, such as hiking, foraging for mushrooms, fishing and crabbing, participating in holiday activities, among others. Olsen admitted that he could continue to engage in these activities if Brightheart relocated. He also stated that given his work schedule, EB would have to spend the time before school, from 6:00 AM to 8:30 AM in daycare.

Olsen expressed his concern regarding the remoteness of the Skalitude property, the safety of the gravel road leading to the property, the lack of cell phone service, and the lack of emergency services and trauma centers in Skalitude's proximity. Olsen believed that Brightheart's lifestyle was "unsafe and inappropriate" in "some ways." VRP (Jan. 3, 2019) at 548. He listed, as examples, the festivals Brightheart attends with "an alternative community of individuals," and her choice to "move to Skalitude or travel back and forth during the winter." *Id.* Olsen qualified his statement by acknowledging that he believed Brightheart was a "good mom." *Id.* However, he doubted viability of the Skalitude enterprise or that engaging in this business would be of benefit in EB's upbringing.

In addition, in both her trial brief and opening argument, Brightheart argued that because relocation was at issue, resolution of the case was governed under the Child Relocation Act (CRA),

RCW 26.09.405-.560, and takes precedence over the permanent parenting plan considerations outlined in RCW 26.09.187. Brightheart maintained that she was therefore entitled to the statutory presumption that relocation should be permitted.

In his trial memorandum, Olsen countered that because Brightheart failed to abide by notice requirements under the CRA, she should not be entitled to the presumption that relocation should be permitted. Olsen argued in his opening statement at trial that,

> [t]his is a parentage action. And if every litigant can simply transform a parentage action into a relocation action by simply in the midst of, and after setting a trial date, announce that they're going to move, and thereby switch the burden of proof and switch the considerations, everybody would do that.

VRP (Dec. 31, 2018) at 15. He asserted that accordingly, the court's concern should be limited to what is in the best interest of the child.

The trial court ultimately ruled that because the CRA applies in cases where only temporary orders have been entered, the CRA governs the analysis of the action. The trial court also rejected Olsen's argument that Brightheart waived the benefit of the rebuttable presumption in the CRA by failing to adhere to the notice requirements, asserting that no authority was cited in support of Olsen's proposition.

The trial court then separately weighed each factor under former RCW 26.09.520 and determined that Olsen proved that the detrimental effect of the relocation outweighed the benefit of the change to EB and Brightheart. On balance, the trial court found that,

> Of the foregoing 11 factors, the Court finds that Factors 1 and 2 are neutral and do not favor either party; Factor 3 favors [Olsen] and no relocation; Factor 4 is technically neutral, however, for the reasons discussed, the fact that [Brightheart] argued what she did to justify a relocation demonstrates to the Court a lack of good faith and favors [Olsen] and no relocation; Factors 5, 6, 7, 8, 9 and 10 favor [Olsen] and no relocation; Factor 11 is not applicable and neutral.

13

CP at 296. Consequently, the trial court denied Brightheart's relocation and entered Olsen's proposed parenting plan that designated him as the primary residential parent. According to the new schedule, EB would reside with Olsen and would have two overnights with Brightheart every other week for a total of four overnights per month.

VI. PRESENTATION OF ORDERS AND BRIGHTHEART'S MOTION FOR RECONSIDERATION

The parties appeared before the trial court for the presentation of orders on April 11, 2019. Brightheart and Pixie had married by this time. In light of the trial court's decision, Brightheart informed the trial court that it was more important to her to forgo the business venture, as well as her marriage to Pixie, to remain EB's primary residential parent. Brightheart stated that she would place both children in school in Jefferson County and make any other assurances demonstrating her intent to remain in Jefferson County as the trial court deemed necessary. Brightheart asked the trial court to enter the plan Olsen proposed as an alternative option if Brightheart did not relocate.

Olsen responded that Brightheart should have raised this issue in a motion for reconsideration that would allow him the opportunity to meaningfully respond. Olsen also asserted that the evidence presented at trial regarding Brightheart's financial commitments to the Skalitude venture, the two LLC's she formed in entering this venture, her commitment to her new marriage, and her prior decision to drive EB back and forth between Jefferson County and Okanogan County, belies Brightheart's claim that she will forgo relocation in earnest.

Brightheart stated that she would raise the issue in a motion under CR 59 or CR 60. The trial court recalled its earlier ruling on the temporary orders and stated that while it initially did not believe it could curb Brightheart's activities in going to eastern Washington during her personal

14

time, in retrospect "it became clear that her moving was a foregone conclusion." VRP (Apr. 11, 2019) at 650-51. The trial court expanded on its conclusion and stated that it had "absolutely no reason to believe that [Brightheart] is making a sincere, genuine return to Jefferson County." *Id.* at 652. The trial court signed final orders, which incorporated the findings in its memorandum opinion, and the parenting plan.

Brightheart filed a motion for reconsideration, which the trial court denied as frivolous, awarding fees to Olsen. Brightheart appeals the trial court's memorandum opinion, the order denying her petition for relocation, the final parenting plan and child support order, and the order denying her motion for reconsideration.

DISCUSSION

I. STANDARD OF REVIEW

This court reviews a trial court's decision to deny relocation and to enter a residential schedule in a permanent parenting plan for an abuse of discretion. *In re Marriage of McNaught*, 189 Wn. App. 545, 552, 359 P.3d 811 (2015); *In re Marriage of Horner*, 151 Wn.2d 884, 893, 93 P.3d 124 (2004). The trial court abuses its discretion where its decision is "manifestly unreasonable or based on untenable grounds or untenable reasons." *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). "'A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard.'" *Horner*, 151 Wn.2d at 894 (quoting *In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997)). A trial court necessarily abuses its discretion if its decision is based on "'an erroneous

view of the law'" or if its decision "'involves incorrect legal analysis.'" *In re Marriage of Selley*, 189 Wn. App. 957, 959, 359 P.3d 891 (2015) (quoting *In re Parentage of A.L.*, 185 Wn. App. 225, 238–39, 340 P.3d 260 (2014)).

This court reviews a trial court's factual findings to determine whether they are supported by substantial evidence. *In re Marriage of Raskob*, 183 Wn. App. 503, 510, 334 P.3d 30 (2014). Evidence is substantial if it is sufficient to persuade a fair-minded individual of the truth of the matter asserted. *Katar*e, 175 Wn.2d at 35. The party challenging the findings of fact has the burden of demonstrating that substantial evidence does not exist. *In re Marriage of Grigsby*, 112 Wn. App. 1, 9, 57 P.3d 1166 (2002). This court does not reweigh the evidence or disturb a trial court's determination regarding the credibility of witnesses. *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017). In addition, this court reviews de novo whether the trial court's findings of fact support its conclusions of law. *Raskob*, 183 Wn. App. at 510

## II. RELOCATION

### 1. LEGAL PRINCIPLES

The CRA, codified in RCW 26.09.405–.560, provides procedural and substantive rules for relocating with children who are the subject of court orders designating visitation or residential time. RCW 26.09.405–.560; *In re Custody of Osborne*, 119 Wn. App. 133, 140, 79 P.3d 465 (2003). A person seeking to relocate with a child may not relocate with their child without the court's approval if another person entitled to residential time or visitation objects to the relocation. *McNaught*, 189 Wn. App. at 553.

"The CRA shifts the analysis away from only the best interests of the child to an analysis that focuses on both the child and the relocating person." *Horner*, 151 Wn.2d at 887. The relocating

person must provide his or her reasons for relocating, and the court must operate under the presumption that the intended relocation will be permitted. Former RCW 26.09.520. This presumption is in accord with the traditional principal that "a fit parent acts in his or her child's best interests, including when that parent relocates the child." *McNaught*, 189 Wn. App. at 555. To rebut the presumption, the party objecting to the relocation has the burden of demonstrating that "the detrimental effect of the relocation outweighs the benefit of the change to the child and the relocating person." Former RCW 26.09.520.

Following an objection, the trial court conducts a fact-finding hearing regarding the proposed relocation. *McNaught*, 189 Wn. App. at 553. The person opposing the relocation has the burden of production and persuasion and must rebut the presumption favoring relocation by a preponderance of the evidence. *Id.* at 549, 553–54.

A trial court has discretion to grant or deny a relocation only after considering all 11 relocation factors in RCW 26.09.520. *Horner*, 151 Wn.2d at 894. The relocation factors are neither weighted nor listed in any particular order. Former RCW 26.09.520. These factors include,

(1) The relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life;

(2) Prior agreements of the parties;

(3) Whether disrupting the contact between the child and the person with whom the child resides a majority of the time would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation;

(4) Whether either parent or a person entitled to residential time with the child is subject to limitations under RCW 26.09.191 [which limits residential time if the parent has engaged in willful abandonment, abuse, domestic violence or assault];

(5) The reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation;

(6) The age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child;

(7) The quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations;

(8) The availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent;

(9) The alternatives to relocation and whether it is feasible and desirable for the other party to relocate also;

(10) The financial impact and logistics of the relocation or its prevention; and

(11) For a temporary order, the amount of time before a final decision can be made at trial.

Former RCW 26.09.520.

2. ANALYSIS

Brightheart argues that in applying the factors under former RCW 26.09.520, although the trial court acknowledged the statutory presumption and the requirement to not only consider whether relocating was in EB's best interest but also in hers, the trial court either minimized or ignored her interests entirely. Brightheart contends that the trial court evinced a preference for a more traditional lifestyle and faulted her for constructing her life in a less conventional manner. She maintains that the trial court's assessment of her lifestyle choices led the trial court to enter findings that were not supported by substantial evidence and to make legal conclusions that were not supported by its findings of fact. Brightheart, therefore, asserts that the trial court abused its discretion in denying her relocation because its ruling was based on untenable grounds and untenable reasons.

We agree that the trial court abused its discretion in denying Brightheart's petition to relocate with EB. With respect to certain statutory factors, the trial court improperly shifted the burden of proof onto Brightheart, relied on findings irrelevant to the factor at issue, or improperly disregarded Brightheart's interests in relocating.[2]

*a. RELOCATION FACTOR 1*

Under the first relocation factor, the trial court was required to consider "[t]he relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life." Former RCW 26.09.520(1).

The trial court found that EB has a "high quality, strong and stable relationship," with both parents and determined that this factor was neutral. CP at 291. However, the trial court also found that "overall [Brightheart] is less stable than [Olsen]." *Id.* The trial court went on to describe Brightheart's employment history, her "sustenance life style," the quantity of her romantic relationships since separating with Olsen, as well as the fact that Brightheart moved to Skalitude before the relocation matter had been resolved as evidence of Brightheart's lack of stability. *Id.* In addition, the trial court found that Olsen has "more than the typical amount" of residential time with EB, minimizing the effect of Brightheart's role as a primary caregiver under this factor. *Id.* The trial court acknowledged EB's relationship with HS, but it found that the two will remain close regardless of whether EB relocates with Brightheart.

Brightheart argues that the trial court erred in finding this factor neutral as opposed to supporting relocation. Brightheart contends that here, the trial court failed to focus on the stability

---

[2] Relocation factor 2, pertaining to prior agreements under former RCW 26.09.520(2), and relocation factor 11, pertaining to temporary orders under former RCW 26.09.520(11), do not apply and are not at issue in this case.

of EB's relationship with either parent, but instead relied on an irrelevant discussion of each parents' stability in terms of their personal lives. She asserts that the trial court also erred in classifying Olsen's residential time with EB as "'more than the typical amount of time.'" Br. of Appellant at 24 n.7. Finally, Brightheart claims that the trial court improperly minimized the importance of EB's relationship with his older brother.

Under the plain language of the statute, the relevant consideration is the stability of the child's relationships with his or her parents, siblings, and other significant persons. Former RCW 26.09.520(1). The trial court did not find any facts, nor does the record suggest that there are any facts, that indicate Brightheart's romantic involvement with either Ralls or Pixie, her employment history, or her "sustenance lifestyle" have destabilized her relationship with EB. Absent this connection, these findings are irrelevant to this factor.

In addition, the trial court's finding that Olsen has residential time with EB "more than the typical amount," is not supported by substantial evidence. *See* CP at 291. There is no evidence in the record designating what quantity of residential time with a non-primary residential parent is typical. The quantity of Olsen's residential time with EB as compared to other non-primary residential parents likewise does not undermine the importance of Brightheart's position in EB's life as his constant, primary caregiver since birth.

Finally, the trial court's finding that EB and HS can remain close if EB does not relocate with Brightheart is not supported by any evidence in the record but instead reflects an expectation or assumption. The trial court determined that denying weekly contact between EB and Olsen would hamper the strength of their relationship in a separate finding, and there is no evidence that the same would not occur to EB's relationship with his brother. These findings, in addition to

being inconsistent, are unsupported by the record. Moreover, this finding is irrelevant under this factor, which by its plain language concerns the relative strength of EB's relationships as opposed to the effect of disruption on his relationships.

The trial court abused its discretion with respect to this factor because it relied on facts that were not relevant and that were not supported by substantial evidence. *See Horner*, 151 Wn.2d at 894. In addition, the trial court erred as a matter of law when it determined that this factor was "neutral" because Olsen has the burden of production and persuasion as the party opposing relocation, *McNaught*, 185 Wn. App. at 549, and in light of the presumption under former RCW 26.09.520, a neutral factor would still have the effect of supporting relocation.

*b. RELOCATION FACTOR 3*

Under the third relocation factor, the court considers "[w]hether disrupting the contact between the child and the person with whom the child resides a majority of the time would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation." Former RCW 26.09.520(3).

The trial court found that Olsen has residential time with EB "every week for at least two days and as frequently, three days, for a total of [five] nights every two weeks." CP at 292. The trial court explained that relocation would "involve long and difficult travel," and that Olsen has "quality time with the child when he has [EB]." *Id.* Meanwhile, although the trial court recognized that Brightheart had been the "primary parent," this was only the case because she had EB "a relatively small majority of the time." *Id.* The trial court determined that to some degree, relocation would disrupt both parents' relationships with EB; "[h]owever, the disruption between the child and [Brightheart] would not be more detrimental to the child than the disruption between the child

and [Olsen]. At worst, the detriment to the child would be equal." *Id.* The trial court tipped the balance of this factor in favor of Olsen and determined that it weighed against relocation because Olsen presented "a more stable situation." *Id.*

Brightheart claims that the trial court abused its discretion in determining that this factor weighed against relocation because the trial court's characterization of Brightheart's residential time as "'a relatively small majority'" was not supported by substantial evidence. Br. of Appellant at 27. In addition, Brightheart asserts that the trial court improperly focused on its assumptions regarding the relative stability of the parents as opposed to the detriment EB would suffer by disrupting contact with either parent. Brightheart alludes to the Washington policy of maintaining continuity in the child's caregiver relationships as further support that a disruption in her relationship with EB would be of greater impact.

The trial court's finding that Brightheart only has a "relatively small majority" of residential time is not supported by substantial evidence. CP at 292. The trial court found that Olsen has consistently had approximately 5 overnights with EB every two weeks, or, extrapolating, 10 overnights every four weeks. Brightheart, meanwhile, has consistently had residential time with EB for 9 overnights every two weeks, or 18 overnights every four weeks. Brightheart has had nearly twice as much residential time with EB as Olsen; this is not a slight majority but a significant portion of time, especially when considered from EB's perspective.

In addition, travel time is an irrelevant consideration under this factor. Both parents would be required to travel with EB, regardless of whether the trial court permitted Brightheart to relocate

with EB.[3] It is not clear why travel time should cause a greater detriment to contact for Olsen as opposed to Brightheart.

Finally, the trial court's finding that disruption of contact between EB and Olsen would be more detrimental due to Olsen's greater "stability" is not supported by substantial evidence. *Id.* The trial court found that Brightheart also had a "high quality, strong and stable relationship" with EB. *Id.* at 291. There is no evidence in the record that EB's physical, emotional, or other needs were not met by either parent. Instead, the evidence demonstrates that EB is "a very bright, healthy, energetic," child who is "thriving and learning," with no special needs or health concerns. VRP (Dec. 31, 2019) at 20. Olsen agrees that Brightheart is a "good mom." VRP (Jan. 3, 2019) at 548. Since their separation in 2015, the parties have maintained a relatively consistent residential schedule with Brightheart being the primary residential parent. Whatever added stability Olsen would provide is not offset by the detriment that EB would suffer as result of a drastic reduction in residential time spent with Brightheart, who has been his primary caregiver since birth.

As to this relocation factor, the trial court abused its discretion because its determination was based on facts that are either irrelevant or that are not supported by substantial evidence.

*c. RELOCATION FACTOR 4*

Under the fourth relocation factor, the court considers "Whether either parent or a person entitled to residential time with the child is subject to limitations under RCW 26.09.191." Former RCW 26.09.520(4).

The trial court determined that the limitations in RCW 26.09.191 do not apply to either parent and that this factor is "technically neutral." CP at 296. Nevertheless, the trial court found

---

[3] An order preventing relocation of a child does not restrain the *parent* from relocating.

that Brightheart "has attempted to raise issues about [Olsen] to buttress her argument," by claiming, for example, that Olsen had a history of alcoholism and that her relationship with Olsen was contentious and hostile. *Id.* at 292. Because the trial court did not find these claims credible, it weighed this factor against relocation because it believed these claims demonstrated Brightheart's lack of good faith.

Brightheart disagrees with the trial court's finding that she raised these claims solely to bolster her position, but she maintains that regardless, this factor should be treated as neutral because it does not apply to this case. We agree with Brightheart that the trial court abused its discretion in weighing this factor against relocation because it is not relevant to this case. There is no authority supporting the trial court's decision to weigh this factor against Brightheart's relocation with EB based on the trial court's determination that Brightheart's claims were not credible.[4]

### d. RELOCATION FACTOR 5

The fifth relocation factor directs the court to consider "[t]he reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation." Former RCW 26.09.520(5).

The trial court weighed this factor against relocation, finding that Brightheart's reasons for seeking the relocation are based primarily out of her self-interest and desire to maintain an "alternative lifestyle." CP at 293. The trial court noted that while this lifestyle would be fine for

---

[4] The trial court's decision regarding this factor is particularly troubling. Its decision to weigh the factor against relocation based on its assessment of Brightheart's alleged bad faith suggests a punitive motivation in making this determination, especially in light of the trial court's recognition that this factor does not apply to this case.

Brightheart, "the issue is, however, whether it is best for the child." *Id.* The trial court expanded on this reasoning, stating that, "[a]lthough it apparently is a dream site for [Brightheart] and she wants this lifestyle, the child does not appear to gain anything by being there." *Id.* at 294. The trial court based its determination on its assertion that Jefferson County is more populated, with closer towns and cities and with greater opportunities for socialization.

The trial court also questioned whether the Skalitude Retreat center would be financially viable and found that Brightheart did not sufficiently "scrutinize the numbers" prior to committing to the venture. *Id.* at 293. In addition, the trial court raised concerns regarding Brightheart's commitment to her relationship with Pixie, noting that although they had a commitment ceremony, "[n]o credible explanation was given as to why marriage was and is going to be deferred so long." *Id.* at 294. The trial court reasoned that this point further goes to her lack of stability which undermines her ability to parent. The trial court acknowledged Brightheart's testimony regarding the quality of schools in the Methow Valley School District, and it found that Brightheart only investigated the local schools after she made the decision to move.

Finally, the trial court determined that Brightheart's decision to live in Skalitude and commute to Jefferson County with EB before the trial court ruled on the matter, reflected "extremely poor judgment and corroborates the [c]ourt's view that this move is proposed for [Brightheart's] desire and supposed benefit and not the benefit of the child." *Id.* at 295.

Brightheart argues that the trial court relied on irrelevant facts and improperly shifted the burden of production and persuasion to her to demonstrate that she had a valid reason for seeking to relocate. She further contends that the trial court's findings reflect a misapprehension of the

CRA, which requires the trial court to also consider whether the relocation would be beneficial to her.

Olsen argues that evidence demonstrates that Skalitude would not be able to pay Brightheart the salary she expects, and it might fail to provide income sufficient to allow Brightheart and Pixie to make their mortgage payments. Olsen responds that the trial court's consideration of Brightheart's relationship to Pixie was relevant in determining her stability. Olsen further asserts that Brightheart's decision to put EB in a situation wherein he would have to commute long hours every week provides further evidence that Brightheart did not relocate out of concern for the best interests of her children.

The trial court erred in weighing this factor against relocation. The trial court improperly disregarded Brightheart's interests in moving, it considered evidence that was irrelevant to this factor as a matter of law, and it relied on evidence that it was not permitted to consider under the CRA.

Brightheart's desire to relocate in order to pursue a business venture, to improve her and children's living conditions from a yurt to a house, and to establish a home with her partner and his children are legitimate reasons for seeking relocation and the trial court erred in discrediting them. In *Horner*, the Supreme Court explained that "the interests and circumstances of the relocating person" are "particularly important." 151 Wn.2d at 894. A trial court errs where it focuses only on the best interests of the child when determining whether to allow relocation. *Id.* at 894. Here, the evidence reflects that moving to Skalitude provided Brightheart a "unique opportunity for a home, work, and co-ownership" which "offers a significant gain and improvement in the quality of life for [her] family." CP at 164. This remains true even if the venture

is not as profitable as Brightheart envisions and even if pursuing this opportunity requires Brightheart to relocate to a less populous county than the one in which she had previously resided.

Despite the requisite emphasis on the interests of the relocating person, here the trial court erred as a matter of law because it relied on facts irrelevant to this factor to countervail Brightheart's legitimate reasons for relocating. In particular, the fact that Jefferson County is more populous and has closer towns and cities than Skalitude does not invalidate the legitimacy of Brightheart's desire to move to Skalitude to live in a manner that is more congruous with her values of "'land-based' living and education.'" *Id.* at 260. In addition, the trial court's finding that Brightheart should have more thoroughly investigated whether the venture would be profitable prior to committing is irrelevant. Relocation may be in an individual's best interest even if the move would not result in greater income. As the trial court here recognized, Brightheart and Pixie testified that "their lives are not about making money or having a better tax return.'" *Id.*

Moreover, the trial court's emphasis on Brightheart's marital status is demonstrative of its legal error in considering irrelevant facts when weighing this factor against relocation. The trial court's finding that Brightheart and Pixie's relationship is not stable due to their two-year delay in getting married is an irrelevant consideration that is also not supported by substantial evidence. Even if Brightheart and Pixie never legally married, Brightheart's desire to reside in Skalitude with her partner is a valid reason to relocate. Nothing about the delay between their ceremonial commitment and legal marriage demonstrates the trial court's underlying premise that the relationship is inherently unstable. The ceremony at Skalitude was consistent with their belief system and demonstrated their commitment to one another. Brightheart and Pixie also demonstrated commitment to one another in forming an LLC to represent their collective interest

27

in the property. Their children have fully integrated and regard each other as siblings. Brightheart's relocation further fosters the commitment to their collective family.

Lastly, under RCW 26.09.530, the trial court is expressly prohibited from considering "evidence on the issue of whether the person seeking to relocate the child will forego his or her own relocation if the child's relocation is not permitted." Therefore, facts implicating Brightheart's decision to move to Skalitude before the trial court resolved the relocation issue are both irrelevant, and under this statute, not properly before the trial court. The CRA does not limit *Brightheart's* ability to relocate to Skalitude regardless of the outcome of her petition to relocate with EB. RCW 26.09.530 expressly removes the parent's personal decision to relocate from the trial court's consideration until relocation with the child has been decided. The fact that Brightheart had already begun to transition to Skalitude before the trial court decided the matter is not relevant and was not a proper basis for determining that this factor weighed against relocation.

e. *RELOCATION FACTOR 6*

The sixth relocation factor directs the court to consider "[t]he age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child." Former RCW 26.09.520(6).

The trial court determined that this factor weighed against relocation because it believed that EB would have greater opportunities to interact with peers in Jefferson County than in Skalitude.

Brightheart argues that the court's finding, based on its belief that raising a child near a populated area is preferable, is not a relevant consideration, nor is the underlying assumption that

EB would have greater interaction with peers supported by the evidence. Olsen defends the trial court's decision on the basis of the trial judge's experience and training.

We agree that the trial court's findings are not supported by substantial evidence. Regardless of whether EB relocates or remains in Jefferson County with Olsen, EB would attend a school program and interact with peers. At Skalitude, EB has the additional benefit of living with and interacting with children his own age. In contrast, there was no evidence presented by Olsen regarding whether EB would have any peers to interact with in the vicinity of Olsen's cabin, which is surrounded by 40 acres of wooded and timber property. Moreover, to the extent that Olsen relies on the trial court's experience and training as a substitute for evidence in the record, we reject this argument. Where challenged, factual findings must be supported by substantial evidence in the record. *In re Marriage of McDole*, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993).

*f. RELOCATION FACTOR 7*

The seventh relocation factor directs the court to consider "[t]he quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations." Former RCW 26.09.520(7).

The trial court found that this factor weighed against relocation because it determined that the overall quality of life in Jefferson County is superior due to access to "more resources; more opportunities; less severe weather," as well as more options for extracurricular activities. CP at 295. The trial court also noted that Olsen expressed safety concerns regarding extreme weather, seclusion, and proximity to emergency services, and it agreed with Olsen that these facts tip the balance against relocation as to this factor.

Brightheart argues that the trial court failed to consider the quality of life and resources available to Brightheart in her current and proposed geographic locations. We agree with Brightheart that in evaluating this factor, the trial court abused its discretion because it failed to tailor its focus on the relocating parent's comparative circumstances.

To the extent the trial court relied on evidence regarding Olsen's proximity to emergency services from his cabin in Discovery Bay as compared to Skalitude's proximity to emergency services, this was error. "By its plain language, this factor considers only the relocating parent's current and proposed circumstances, with no counterbalanced consideration of the other parent's circumstances." *Bergerson v. Zurbano*, 6 Wn. App. 2d 912, 922, 432 P.3d 850 (2018). Therefore, the trial court should have measured the distance to emergency services as compared between Brightheart's home in Irondale and her home in the Methow Valley. *See id.* at 922. Olsen testified regarding *his* proximity to emergency services and expressed concern that Brightheart's residence in Methow Valley is an hour or more away from a trauma center. There was no similar testimony regarding the distance between Brightheart's Irondale home and emergency services.

With respect to quality of life, opportunities, and extracurricular activities available in both geographic locations, the trial court made the same error when it "agree[d] with [Olsen]" that greater resources were available in Jefferson County as opposed to Okanogan County. CP at 295. Olsen's testimony was limited to *his* activities with EB and to the resources available to EB by virtue of the time they spent together in Jefferson County. For example, Olsen described the proximity of his cabin to various places for recreation, access to a fishing pier that was limited to employees at Olsen's place of work, gardening at Olsen's cabin, and other local activities that Olsen and EB engaged in during Olsen's residential time. Therefore, in affirmatively agreeing with

30

Olsen's argument regarding available resources, the trial court necessarily weighed the objecting parent's circumstances, which is improper under this factor. *See Bergerson*, 6 Wn. App. 2d at 922.

Consequently, to the extent that the trial court relied on a comparison of Olsen's circumstances in Jefferson County to Brightheart's circumstances at Skalitude when weighing this factor against relocation, it abused its discretion.

g. *RELOCATION FACTOR 8*

Under the eighth relocation factor, the court considers "[t]he availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent." Former RCW 26.09.520(8).

The trial court determined that this factor weighed against relocation because "[w]eekly contact would not be possible," and "[t]he drive is remarkably long." CP at 295. Brightheart argues that distance and difficulties in traveling are unavoidable regardless of the trial court's decision on relocation and that Olsen did not meet his burden of persuasion and production as to this factor. Moreover, Brightheart asserts that disruptions can be mitigated through other means of contact than residential time. We agree with Brightheart that the trial court abused its discretion in determining that this factor weighed against relocation.

First, as the party opposing relocation, Olsen has the burden of production and persuasion and it is not incumbent on Brightheart to demonstrate that alternative arrangements are indeed available. *See McNaught*, 189 Wn. App. at 556. Instead, Olsen had the burden of showing that alternative arrangements to denying relocation would be insufficient to foster and continue his relationship with EB. Former RCW 26.09.520(8).

In determining that this factor weighed against relocation, the trial court erred as a matter of law in interpreting this factor to require the parties to maintain, in effect, the same residential schedule or quantity of residential time as under the prior arrangements. The trial court weighed this factor against relocation based on its findings that "weekly contact would not be possible" due to the "remarkably long" drive. CP at 295. However, "[r]elocations involve new time and distance factors that will inevitably require dramatic changes to a parenting plan." *In re Marriage of Fahey*, 164 Wn. App. 42, 68, 262 P.3d 128 (2011) (upholding a trial court's decision to grant a relocation petition from Edmonds, Washington, to Omak, Washington); *see also In re Parentage of R.F.R.*, 122 Wn. App. 324, 327, 333, 93 P.3d 951 (2004) (upholding relocation from Washington to Indiana).

This factor does not require the parties to maintain the same quantity of residential time, it only pertains to whether the child could continue his relationship with and access to the other parent. Former RCW 26.09.520(8). The evidence does not support the trial court's finding that Olsen could not maintain a relationship with EB upon EB's relocation. Following relocation Olsen would still have residential time with EB. Under the plan Brightheart proposed, aside from holidays and summer break, Olsen would have 6 overnights with EB monthly, as opposed to the 10 he had under the prior arrangement. In addition, although Skalitude has limited cell reception, there is a landline and internet service there that would allow for continued communication between Olsen's residential time.

### h. RELOCATION FACTOR 9

Under the ninth relocation factor, the court considers "[t]he alternatives to relocation and whether it is feasible and desirable for the other party to relocate also." Former RCW 26.09.520(9).

With regard to this factor, the trial court found:

> [Brightheart] argues that [Olsen] has had varied employment experience and could possible [sic] get a job in the Methow Valley. [Olsen] says it is not feasible for him to relocate to Methow Valley; he has a very good and stable job with the federal civil service here and it would make no sense for him to leave that and go to Methow Valley. With respect to [Brightheart], the only alternative to relocation would apparently be not to relocate. The Court agrees with [Olsen]

CP at 296.

Brightheart argues that Olsen did not meet his burden of proving that his relocation was not feasible or desirable. Instead Brightheart contends that the trial court "gave [Olsen] a pass" as to this element, shifting the burden of demonstrating that Olsen could relocate closer to the Methow Valley onto her. Br. of Appellant at 40. Olsen responds that Brightheart did not provide any legal authority supporting her claim that "somehow [Brightheart's] desire to relocate to Skalitude placed on [Olsen] the burden of finding comparable employment there or at least disproving his ability to do so." Br. of Resp't at 42-43. The trial court abused its discretion in weighing this factor against relocation because the trial court improperly shifted the burden of production and persuasion to Brightheart and failed to apply the presumption in favor of relocation.

The presumption under RCW 26.09.520 operates to shift "the burdens of persuasion and production to a party opposing relocation." *McNaught*, 189 Wn. App. at 556. Brightheart is therefore correct in asserting that Olsen was required to demonstrate that moving would not be feasible and desirable. Former RCW 26.09.520(9). However, Olsen did not present any evidence that he would be unable to transfer to a similar civil service position in Okanogan County, nor any evidence that he had even looked into whether such positions would be available there.

Aside from his current employment at a U.S. Naval facility that Olsen had started nine months prior to trial, Olsen did not present any other reasons that he could not relocate from

Jefferson County, such as strong familial and community ties or property ownership. But the trial court deferred to Olsen's position, summarily finding that relocation would make "no sense" because of his current employment. CP at 296. That reasoning alone is insufficient to overcome the presumption in favor of relocation and to carry Olsen's burden of demonstrating that relocation would not be feasible and desirable for him.

*i. RELOCATION FACTOR 10*

The tenth relocation factor directs the court to consider "[t]he financial impact and logistics of the relocation or its prevention." Former RCW 26.09.520(10).

With respect to this factor, the trial court found,

> The relocation, if it were to occur, would necessarily greatly increase travel expenses and travel time for each parent. The evidence was that it's a six hour drive from Skalitude to Irondale. [Olsen] argues that if the relocation is denied, there would be no impact on [Brightheart]. It would appear to the Court that would only be true if [Brightheart] did not relocate herself.

CP at 296. The trial court found that this factor weighs against relocation.

Brightheart contends that the cost and length of travel is irrelevant and inescapable because the trial court must assume, under the CRA, that she will relocate. Brightheart further argues that the trial court failed to consider that there would be additional financial impacts in denying relocation because EB would require daycare if Olsen became the primary residential parent. Olsen counters that if Brightheart did not relocate to Skalitude, she would not incur travel expenses but could save money and obtain a part-time minimum wage job in Jefferson County. We agree with Brightheart that the trial court erred because travel expenses, time, and Brightheart's hypothetical financial condition if she forgoes relocation are not relevant considerations.

As described above, under RCW 26.09.530, the trial court is not permitted to admit or consider evidence regarding whether Brightheart would forgo her relocation if EB was not permitted to relocate with her. Accordingly, Brightheart's financial circumstances if she were to remain in Jefferson County, as Olsen suggests, are not a proper consideration before the trial court. In addition, because the trial court must assume, under this statute, that Brightheart will relocate, Brightheart is correct in stating that travel costs and time will be incurred regardless of whether the trial court allows or restrains relocation unless the trial court denies Brightheart residential time with EB entirely. The trial court's findings do not support its determination that this factor weighs against relocation, and Olsen did not carry his burden of production and persuasion as to this factor. *McNaught*, 189 Wn. App. at 556.

j. SUMMARY

We hold that, for the reasons discussed above, the trial court erred in determining that factor 1 was "neutral" and that factors 3, 4, 5, 6, 7, 8, 9, and 10 weighed against relocation. CP at 296.We therefore reverse the order denying relocation and remand for further proceedings.

III. PERMANENT RESIDENTIAL SCHEDULE, CHILD SUPPORT ORDER, AND MOTION FOR RECONSIDERATION

Because we reverse and remand for a new hearing on Brightheart's petition for relocation, we also reverse and vacate the permanent residential schedule and the order awarding Olsen child support that followed from the trial court's decision on relocation. In addition, given our holding, Brightheart's motion for reconsideration regarding the permanent residential schedule was not frivolous. Accordingly, we reverse and vacate the attorney fee award that the trial court imposed against Brightheart for filing her motion for reconsideration.

IV. ASSIGNMENT ON REMAND

Brightheart requests that this court reassign the matter to a different judge on remand. She argues that reassignment is appropriate here to avoid the appearance of unfairness or bias because the trial judge exhibited a "distaste" for Brightheart's lifestyle preferences. Br. of Appellant at 48.

Reassignment is appropriate to avoid the appearance of unfairness or bias. *In re Marriage of Muhammad*, 153 Wn.2d 795, 807, 108 P.3d 779 (2005). This court may reassign a case before a different judge on remand where "'the trial judge will exercise discretion on remand regarding the very issue that triggered the appeal and has already been exposed to prohibited information, expressed an opinion as to the merits, or otherwise prejudged the issue.'" *Black*, 188 Wn.2d 114, 137, 392 P.3d 1041 (2017) (quoting *State v. McEnroe*, 181 Wn.2d 375, 387, 333 P.3d 402 (2014) (footnote omitted).

To preserve the appearance of fairness, because the trial judge has already addressed the issue that triggered this appeal, reassignment before a different judge is appropriate. *See id.*

ATTORNEY FEES

Olsen requests an award of attorney fees on appeal under RAP 18.9(a) for having to defend against Brightheart's allegedly frivolous appeal. An appeal is frivolous if there are no debatable issues on which reasonable minds can differ and is so totally devoid of merit that there was no reasonable possibility of reversal. *In re Recall Charges Against Feetha*m, 149 Wn.2d 860, 872, 72 P.3d 741 (2003). Brightheart prevails on appeal. Accordingly, we deny Olsen's fee request.

CONCLUSION

We hold that the trial court abused its discretion in denying Brightheart's petition to relocate with EB. Because we reverse the trial court's decision on relocation, we also reverse and

vacate the permanent residential schedule and the child support order. We also vacate the attorney fee award that the trial court imposed on Brightheart following from her motion for reconsideration. We remand this matter for a new hearing on Brightheart's petition for relocation. Finally, we agree to reassign this matter before a new judge.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

LEE, C.J.

GLASGOW, J.